# PETITION: UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS

**Plaintiff**

> Gordon Knight
> 7198 Indian Wells
> Sanger TX 76266

v.

**Defendant**

> AltruPay LLC
> 1412 Main Street, Suite 1150
> Dallas TX 75202

**JURY TRIAL DEMANDED**

### PLAINTIFF'S STATEMENT OF CLAIM

**The Plaintiff:**

The Plaintiff is Gordon Knight ("Knight"), resident of Texas and sole owner of PS Knight Americas Inc ("PSK"), a TX corporation operating in and from the Denton area of North Texas, publishing electrical guidebooks for the Canadian market.

**The Defendant:**

AltruPay LLC ("AltruPay") is a merchant account provider formerly furnishing credit card processing services in contract to PSK, located in Dallas, TX.

AltruPay is partnered with FFB Bank ("FFB") (aka: Fresno First Bank), a financial entity unlawfully acting under the direction of an Agency of the Government of Canada known as CSA Group ("CSA") (d.b.a./a.k.a.; the Canadian Standards Association), a long-time competitor to, and adversary of, PSK and Knight.

**Nature of the Action:**

1.    The Defendant, AltruPay, operating on false information furnished by the Defendant's partner, FFB, did cause and / or effect in the benefit of a foreign government;

1

- The constriction and eventual termination of sales on the PSK website resulting in financial loss to both PSK and Knight;
- The unilateral cancellation of the PSK – AltruPay contract resulting in the total loss of PSK retail sales and consequent damage to PSK and Knight;
- The unlawful seizure of PSK reserve funds in AltruPay's possession, further damaging PSK and Knight;
- The illegitimate tarnishing of the PSK brand and Knight reputation in terminating the PSK presence in its own market, and;
- The illegitimate slandering of PSK and Knight as money launderers and terrorists.

2.   Specifically, FFB fraudulently designated both PSK and Knight on the Member Alert to Control High-Risk ("MATCH") financial blacklist, an anti-terrorism and anti-money laundering ("AML") protocol.  The Defendant, AltruPay, without conducting even basic due diligence did act upon their partner's fraudulent designation to harm PSK and Knight, then lied to the Plaintiff about the nature of AltruPay's conduct against Knight's company, thereby preventing Knight from defending himself against the fraudulent designation and salvaging his company.

3.   Upon Knight's information and belief, FFB committed the fraudulent listing under the direction of CSA Group, an Agency of the Government of Canada and PSK's commercial competitor ("CSA"), in order to harm PSK and thereby to harm Knight.  In this, AltruPay was acting on the direction of FFB, itself under the direction of a foreign government in harming a Texas corporation and its owner, Knight.

4.   PSK is the sole financial asset and only revenue source for Knight.  AltruPay's fraudulent conduct resulted in the total and ongoing cessation of PSK's retail sales.

5.   In these actions and through these consequences, AltruPay has inflicted financial and reputational harm on both parties through its fraudulent conduct; PSK and its owner, the Defendant, Knight.

6.   A very limited PSK Claim against AltruPay was filed in The Justice Court, Precinct 5, Denton County, Texas, on May 23, 2025 [S25-0068J5], along with the related PS Knight Americas Inc v. Paymentech filing in the same Court [S25-0072J5].  This latter filing was dismissed without prejudice on November 10, 2025 for Lack of Personal Jurisdiction [Ref p.408].  As the PSK Claim against AltruPay in The Justice Court would face the same jurisdiction impediment, the Claim against AltruPay was withdrawn.  This filing against AltruPay by Knight in Federal Court is a revision of the original Justice Court filing, broadened in the absence of Justice Court restrictions of scale, severity, and compensation.

7.   In this context, this pro se Federal Court filing by Knight, as the ultimate affected party, is the only recourse financially viable under circumstances created by AltruPay on the instructions of their partner, FFB.

8.   Knight brings this civil action and seeks;

    a.   A Finding that the PSK contract was falsely terminated by AltruPay;

    b.   A Finding that AltruPay's fraudulent conduct toward PSK and Knight constitutes a breach of contract;

    c.   A Finding that by its fraudulent conduct toward Knight and his company, AltruPay is responsible for resulting financial harm on PSK and, directly and by extension, Knight, and an Order for compensation;

    d.   A Finding that by its fraudulent conduct toward PSK and Knight, AltruPay is responsible for public disparaging of PSK and misrepresenting PSK conduct, constituting false, misleading and deceptive business practice, is a defamation of PSK and, directly and by extension, Knight, and an Order for compensation;

    e.   An Order for compensation in the sum of all matters being $20MM, a placeholder amount;

    f.   A Finding in this matter before the Court that AltruPay is under the direction of FFB, itself under the direction or control of the Government of Canada through the latter's Agency; CSA;

    g.   A Finding that AltruPay has, in this instance, unlawfully operated as an arm of a foreign power (Canada) inside the United States to impede, harass, and harm a citizen of the United States (PSK) and its owner (Knight), and;

    h.   A Finding that based on the above, AltruPay is in breach of the following Causes, Federal and State Statutes and Executive Orders, subsequently actionable in criminal proceedings, listed as;

        – Breach of Contract
        – Lantham Act
        – Commercial Disparagement
        – Defamation
        – Tortious Interference
        – Negligence
        – Bank Fraud Statute
        – Bank Secrecy Act
        – Wire Fraud Act
        – Consumer Financial Protection Act

**Jurisdiction and Venue**

9.   The United States District Court, Eastern District of Texas is the correct jurisdiction because all claims are Federal.

10.   The United States District Court, Eastern District of Texas, is the correct venue because Knight is resident within Denton County, within which AltruPay's actions against PSK and Knight were affected.

**Factual Background**

Who is the Canadian Standards Association?

11.   The Canadian Standards Association ("CSA") has described itself as a "private not-for-profit corporation" in most of its legal filings in the United States [Ref. p.48, 50, 55].

12.   In public however, CSA has claimed a variety of contradictory legal statuses. In China, CSA claims to be an Agency of the Government of Canada. Across the straight in Taiwan, CSA claims to be a US corporation headquartered in Ohio. In the US, CSA claims to be an ISO, an International Standards Organization without nationality. To the IRS, CSA has registered as a Business League and is therefore tax exempt [Ref. p.104 - 109]. To US customers, CSA claims to be a corporation offering products and services, though both are barred by its Business League registration. To US corporations, CSA claims to be a regulatory body authorized to sell them influence over the drafting of domestic laws in Canada and, to an extent, laws in the US as well [Ref. p.110 - 111]. To community groups and activists, CSA claims to be a likeminded public interest body working for the greater good and drafting standards, not laws [Ref. p.112 - 119]. Hiding in ambiguity, CSA claims to be whatever they perceive the audience needs to hear to deliver to CSA whatever they want.

13.   Of CSA's many conflicting legal status claims, only one is accurate; CSA is an Agency of the Government of Canada. Examples follow.

14.   Government has affirmed that CSA "is in fact a public entity. It is an extension of the arm of the Government of Canada. All of its employees work for the Government of Canada. Its processes are pursuant to the Government of Canada" [Ref. p.140 - Lines 15 - 40, 141 - Lines 6 - 21].

15.   CSA's unionized staff are members of a public sector union, the Canadian Union of Public Employees (CUPE), Locals 967 and 4559 [Ref. p.164 - 166, 197]. CUPE entered CSA in 1970, at the same time CUPE unionized the other Government departments and agencies which form the current CUPE locals.

16.   On December 16, 2016, Government testified in Ontario Court that "these [CSA staff] are public officials, which they are" [Ref. p.219 - Line 29]. Further, CSA "is a public authority" [Ref. p.221 - Line 14, 1222 - Line 25].

17.   Justice Quamina of Ontario Court Ruled that CSA is part of Government, in the least standing under "loco parentis" with regard to higher government authorities and is established by Government statute [Ref. p.294 - Line 10 - 20], and pointed out that CSA salaries are "set by the Government" [Ref. p.296 - Line 15]. The Court noted that its Ruling with regard to CSA was directed "to the Government," not to a not-for-profit [Ref. p.294 - Line 19].

4

18.  CSA's own Board of Directors have questioned its legal status.  In a meeting of the Board's Executive Operations Committee on October 12, 2012, Board Members raised the question; "Who owns us and why are we here," and relatedly asked; "Have we outgrown our Legislative Mandate?" [Punctuation in original] [Ref p.]

19.  As for history, the CSA was founded in London, UK in 1917 by the then Government of the British Empire [Ref. p.141, 304 - 311].  This founding is verifiable through original, though peripheral sources, those in British Government Archives for instance but Canadian records are restricted from public access by CSA.  This restriction was demonstrated as a number of Members of Parliament, acting on Knight's behalf, requested access to original patriation documents for CSA, covering the transfer of the Agency from the British Empire to the Dominion of Canada, and were stalled for months, then denied entirely.  CSA itself refuses to comply with Canada's version of Freedom of Information filings (Access to Information and Protection of Privacy, or ATIP, filings) based on its claim to be a private entity.

20.  Government has admitted in Court that "…pursuant to its creation by either the previous entity, the British Government and its subsequent entity of the Government of Canada […]" [Ref. p.219 - Line 16].

21.  Whereas CSA has repeatedly testified in Court that it was founded in 1919, they have declined to explain how CSA sent delegates to a series of munitions conferences during the First World War (in October, 1917 and April, 1918) [Ref. p.306, 316 - 317], or how CSA appointed two subcommittees on munitions two years before they claim to have existed [Ref. p.317]. According to British archive, CSA delegations were accredited as Canadian Government representatives at munitions conferences.

22.  CSA is also listed as a Government Agency in municipal phone directories in every year from patriation to Canada in 1919 until 1970, when Parliamentarians began asking pointed questions as to CSA's legal status [Ref. p.1 - 47].

23.  Likewise, the Canadian Federal Government's own internal telephone directories show CSA as a Federal Agency, housed in Government buildings and within Government departments, consistently, year after year, for decades. These directories not only record CSA as a Government Agency, but also show CSA as a subsidiary tenant of Industry Canada occupying a series of Government offices over the course of decades [Ref. p.3 – 47].

24.  CSA has been afforded powers of legislation and runs Parliamentary legislative committees, unilaterally amending by their own admission >2,000 laws [Ref. p.48, 319, 320 - 322].

25.  Indeed, CSA has been granted "Accepted-as-Amended" authority to change / edit / amend domestic law without Parliamentary or other legislative review.  In example, the Province of Alberta is one of many such Canadian jurisdictions in which CSA has autonomous legislative authority [Ref. p.323 – 326, more examples at 327, 328].  Such authority is intrinsically both legislative and public, not private. It is noteworthy that CSA denies the existence of this authority in public [Ref. p.48].

26.  CSA has been granted "limited protections from civil proceedings," that is, legislative immunities for their Government functions [Ref. p.332 - 333].  Such immunities are only granted to

government bodies, those deemed non-litigable as such entities are acting in the name of the Government of Canada and purportedly in the interests of the citizens of Canada.

27.    As with other Government Agencies, CSA was granted franking privileges, allowing them to ship anything from postcards to pallets, mail or freight, without charge as a departmental expense of the Canadian Government [Ref. p.307; See also p.303 - 311].  In this, whenever CSA sent something, the words "Government of Canada" were found where the postmark would normally appear.

28.    In 2014, the then CEO of CSA, Ash Sahi, admitted during negotiations with Knight that CSA was, and remains, an Agency of Canada's Government [Ref. p.337 - 338].

29.    Courts in Canada and the US have repeatedly ruled on assessing the actual legal status of entities cloaked in ambiguity, as between public vs private.

30.    In Canada, the key legal principles involved in such assessments are;

- the Nature of the Entity;
- the Degree of Government Direction or Control;
- the Nature of the Function, and;
- the Statutory Context.


Nature of the Entity

31.    Is the entity inherently governmental?  That is, was it created by the national government with government appointments or funding?  Alternately, is the entity structurally and by its inception private?

32.    CSA was created by Royal Charter of the British Government in 1917 as an entity reporting to the Privy Council Office, then patriated via bilateral agreement with Canada in 1919 and given a Canadian Government Charter as an Agency of the Department of Industry and Trade, and staffed and funded directly by the Canadian Government.  There has been only one change to CSA's Charter since inception, in 1944, which altered sundry items including a shortening of its name but did not change its reporting, funding, direction, or governmental authorities.

Canadian Supreme Court Example;

**CCH Canadian Ltd. v. Law Society of Upper Canada, 2004 SCC 13**


Degree of Government Direction or Control

33.    Is the entity under routine or regular government control (e.g.; board appointments, policy approvals, funding)?  Or does the entity enjoy deep operational autonomy?

34.    CSA reports to the Minister of Industry via the Standards Council of Canada (itself an entity of the Department of Industry, created in 1970), and CSA is entirely operationally devoted to

regulatory activity (drafting legislation, inspecting and certifying regulatory compliance), usually has representation on its board from other government Agencies, and CSA has been heavily funded by the Canada's Federal Treasury in every year for the last 106 years.

Canadian Supreme Court Examples;

**Greater Vancouver Transportation Authority v. Canadian Federation of Students — British Columbia Component, [2009] 2 S.C.R. 295**
**Stoffman v. Vancouver General Hospital, [1990] 3 S.C.R. 483**
**Douglas/Kwantlen Faculty Assn. v. Douglas College, [1990] 3 S.C.R. 570**

Nature of the Function

35.    Is the entity performing a specifically governmental function or implementing a government policy?

36.    CSA is drafting and amending legislation.  As noted above, CSA has authority to run legislative committees and, through Accepted-as-Amended provisions, may alter the text of law without Parliamentary review.  With this authority, when CSA amends legislation that change is automatically law and immediately enforceable as law.  This function and authority is unambiguously governmental.

Canadian Supreme Court Examples;

E**ldridge v. British Columbia (Attorney General), [1997] 3 S.C.R. 624**
**Stoffman v. Vancouver General Hospital, [1990] 3 S.C.R. 483**

Statutory Context

37.    In non-Charter of Rights and Freedoms cases, Canada's courts examine the entity's statutory purpose in determining its public or private character.

38.    CSA was created by government specifically to draft legislation and regulations.  This is intrinsically governmental.  The statutory purpose is plain.

Canadian Supreme Court Examples;

**Greater Vancouver Transportation Authority v. Canadian Federation of Students — British Columbia Component, [2009] 2 S.C.R. 295**
**Douglas/Kwantlen Faculty Assn. v. Douglas College, [1990] 3 S.C.R. 570**

39.    Likewise, United States' courts have ruled on assessing legal status of seemingly private entities enjoying government powers.  Similar to Canadian rulings, US courts focus on;

-    Questions of creation and control of the entity;

- Their operational purpose, and;
- The constitutional context (the specific right or obligation at issue).

US Court Examples;

**McCulloch v. Maryland (1819)**
**Dartmouth College v. Woodward (1819)**
**Bank of Augusta v. Earle (1839)**
**Lebron v. National Railroad Passenger Corp. (Amtrak) (1995)**
**Department of Transportation v. Association of American Railroads (2015)**

40.    Historically, cases like McCulloch and Dartmouth established parameters for distinguishing public and private corporations, while modern cases like Lebron refine the analysis for government-created entities. Notably, Courts have been more inclined to treat corporations as private when granting constitutional protections (e.g., Santa Clara) but as public when imposing constitutional obligations (e.g., Amtrak).

41.    Given CSA's Government status in its home Country, that Country's case law affirming that status, CSA's own statements and other Canadian Government statements affirming its Government Status, and its ongoing operation as a Government entity, there seems little room in US law to conclude that CSA is anything other than what it appears to be; an Agency of the Federal Government of Canada.

## The Plaintiff and its Business

42.    PSK was founded as PS Knight Co Ltd in Canada in 1967 and continued into TX in 2020. The relocation of PSK was a direct result of excessive competitive pressure in Canada from PSK's only competitor, a Canadian Government Agency of Industry Canada (Dept. of Trade and Industry) known as CSA.

43.    CSA drafts more than 2,000 laws in Canada, including electrical law. PSK guidebooks reference and quote from the law for purposes of instructing on compliance with law.

44.    In 2012, CSA started a series of litigations against PSK, claiming that PSK was breaching their copyright in "their" laws by quoting from electrical laws that CSA had a role in drafting. That is, CSA was claiming to own Canadian legislation privately. Their argument to Court was that nobody can reference the law, quote from the law, or instruct on the law without paying CSA a royalty for doing so. In reality, CSA was trying to get rid of PSK books, the only competition to theirs. In all, CSA launched 8 near-duplicate litigations against PSK.

45.    One of these CSA lawsuits against PSK was filed in US Federal Court in 2021 [Ref p.49 – 103 in ex.]. In this lawsuit, CSA argued that Rulings of courts in Canada are enforceable inside the United States, even if the provisions of these Rulings conflict with US law. In this instance, they argued that Canadian Rulings stating that laws in Canada, including electrical laws, are privately owned and therefore subject to restricted access by the private owners must also apply inside

the United States.  In this context, PSK's guidebooks which quote from Canadian law should be banned by US courts in order to comply with Canadian Rulings, even though US law does not acknowledge private ownership of legislation.

46.   On Aug 9 2024, the Fifth Circuit Court of Appeal decisively Ruled in favor of PSK [Ref p.339 – 356, 357 – 358].  According to the Ruling, Canada's decision to make legislation private property is not enforceable inside the US and therefore PSK did not violate US law with its product sales, has not been selling illegal products, and is not barred from publishing and selling guidebooks on Canadian electrical laws from the United States.

47.   CSA appealed the Fifth Circuit Ruling to the Supreme Court and on Jan 21, 2025 their appeal was declined by the Court [Ref p.361].  The matter is therefore no longer litigable.  PSK is vindicated, PSK books are lawful and legitimate, and PSK publication and sale of them from the US is, and always has been, entirely legal.

48.   While these cases and appeals were underway, CSA started targeting PSK vendors, clients, and contractors and sullying PSK's reputation in the market.

49.   Specifically and in example, CSA issued a public "Safety Alert" regarding PSK books, claiming 180 "differences" between PSK book and their version of PSK books, which "raise urgent safety issues" to the safety of the public [Ref p.362].

50.   Among the "urgent" safety issues was the spelling of "wastewater" (CSA) vs "waste water" (PSK). However baseless, CSA posted their safety notice on their government website and sent copies of it to academic markets, contractors - everyone they could think of that dealt with PSK. Then CSA had the Provincial Government of British Columbia blacklist certain PSK books entirely on this basis.

51.   CSA began using its governmental authorities to extrajudicially harass and harm PSK.  Threat letters on Government letterhead were sent to PSK vendors, contractors, (etc.) telling them to refrain from using PSK books as they infringed copyright, were erroneous and thus dangerous to public safety.  CSA succeeded in having PSK websites repeatedly taken down on this basis, most recently in November, 2021.

52.   In the fall of 2022, PSK published *Deep 6 Diaries*, a book chronologizing PSK's CSA experience, the story of their targeting PSK.  In response, after the *Deep 6 Diaries* release announcement CSA advised credit card companies and US financial institutions that PSK had been found guilty of money laundering in Canada.  This was untrue but it resulted in PSK being put on an anti-money laundering and anti-terrorism blacklist, called the Member Alert to Control High-Risk list (the "MATCH" list).  The first listing of PSK on MATCH was by CSA proxy BMO Bank National Association ("BMO"), a US subsidiary of the Bank of Montreal, a Canadian financial institution [Ref p.364].  FFB would follow BMO as another CSA proxy, listing PSK on February 6, 2025, a mere 57 days after its partner AltruPay was contracted by PSK [Ref p.363, 365 - 373].  With the MATCH listing, PSK's ability to accept credit card transactions was terminated.  In this, *Deep 6 Diaries* could no longer be sold on the PSK site, thus an embarrassing liability to CSA was supressed.  Indeed, nothing at all could be sold on the PSK site, removing CSA's competition entirely.

53.    The standard means of removing a company wrongfully listed on MATCH, and thereby restore its revenues and recover falsely seized funds, is through litigation. About one month after the false filing on MATCH however, and through its government allies, CSA seized $50,000 from PSK's US corporate account at Chase as punishment for supposed money laundering and / or terrorism. Thus, PSK could not afford legal counsel to defend against the false MATCH listing nor to recover the funds seized on the basis of that false listing.

54.    Unable to sell on the PSK site, PSK created an Amazon account to sell *Deep 6 Diaries* there. Approximately one week later, CSA advised Amazon that *Deep 6 Diaries* was a counterfeit book and demanded it be delisted. Amazon complied. *Deep 6 Diaries* was no longer available on any major retail platform and was, in effect, a banned book. Likewise, PSK instructional guidebooks were unavailable online. The Canadian Government had succeeded in banning perfectly legal books inside the United States.

55.    In all of this, and as one might expect, the loss of retail revenues and related loss to corporate reputation was severe. But, with the Fifth Circuit Ruling solidly in favor of PSK and no injunctions in place or even filed, there was the prospect of partial recovery.

56.    Now armed with this legal vindication, and after a two-year drought of sales, PSK approached AltruPay in December of 2024 to set up a merchant account with them.


**The AltruPay Experience**

"Al-tru-ism:
The belief in or practice of selfless concern for the
well-being of others"
AltruPay slogan [Ref p.374]


"Hahaha.  This fucking guy."
AltruPay CEO Adam Carlson on his treatment of Knight [Ref p.375]


57.    The PSK application with AltruPay was submitted at 4:45PM, Dec 11, 2024.  The PSK application was forwarded by AltruPay to their underwriting at 4:54PM, Dec 11, 2024 [Ref p.365 – 373].

58.    Initial discussions were cordial, as; "we aim to ensure you have a smooth and seamless experience with your new payment processing account [and] We're here to support you every step of the way, so please don't hesitate to reach out if you have any questions" [Ref p.376].

59.    As requested by AltruPay, an introductory videoconference was arranged with King for Dec 17, 2024 [Ref p.376]. PSK was proactively transparent with AltruPay, taking pains to note that relaunching online sales was made possible by PSK winning US court cases, that PSK's customer base was almost entirely inside Canada, that PSK had a predatory commercial competitor and

that competitor had fraudulently listed PSK on MATCH, and that PSK was working to have the false listing corrected.

60. Though PSK's customer base had already been fulsomely discussed with King the previous week, at 3:19PM, Dec 23, 2024, AltruPay's Christine Pohl asked via email "who the customer base is and what percentage of the sales through the URL (https://psknight.com/) are international sales" [Ref p.377].

61. PSK's response at 3:43PM the same day reads;

> *"In answer to the question… We sell books for the electrical profession, persons requiring compliance with the Canadian Electrical Code (the "Code"). The Code is the body of law governing electrical wiring in Canada, Bahamas, and other smaller jurisdictions. Most users of the Code will be either Canadian or entities requiring compliance with the Code for import into Canada. […] In this context, the site sells in USD because we are based here and legally domiciled here but we provide CAD estimate pricing because, while the Code is law in other countries, **the overwhelming majority (>90%) of our clients are either in Canada** or manufacturing for export into Canada."* [emphasis added] [Ref p.378]

62. Pohl's AltruPay response was "Thank you!" Just two words, neither suggesting any concern [Ref p.379].

63. The following week PSK found that a "ticket" had been opened on the AltruPay client portal. PSK emailed AltruPay intake the following at 1:19PM, Jan 2, 2025 [Ref p.380];

> *"We received another response on the Approval Documents ticket (https://altrupayportal.com/ticket/default/view?id=1001197) advising that majority of sales must be "through" the US. I don't know what this means really, as we're a TX corp, located here, so all sales into Canada, or anywhere else, are "through" the US. **We've been transparent in all of this** so I'm unsure how to solve the situation. In this;*
>
> *Could you advise what we can do to satisfy whomever is raising the objection? And;*
>
> *Could you confirm that we're still live and processing as we work through the issue?"* [emphasis added]

64. This ticket was the <u>first mention</u> by AltruPay defining the problem as the location of PSK customers

65. At 1:58PM the same day, Pohl responded as follows;

> *"We currently only provide domestic US merchant accounts, which means sales made to non-US card holders must remain below 30% to meet card brand regulations. If you require more than 30% of non-US card holder sales then you will need an offshore or international merchant account"* [Ref p.381].

66.    This was the second statement by AltruPay defining the problem as the location of PSK customers.

67.    PSK responded at 2:22PM the same day as follows;

> "I rather wished this had been pointed out previously. I don't recall any feedback to this affect during discussions about our business, its products, or its customers" [Ref p.382].

68.    PSK further responded, this time to Kyle King at AltruPay, at 2:26PM the same day, as;

> "As below [the Pohl email that day], it seems we're in trouble. [...]. FYI, we were referred to AltruPay by Jim Wead at BasisTheory specifically because he knows Bill Glass quite well and assured us of alignment, both in service and philosophy" [Ref p.383].

69.    Pohl emailed at 2:38 the same day as follows;

> "To continue using this account, payments from international/non-US card holders must remain below 30% to meet card brand regulations" [Ref p.384].

70.    This was the third statement by AltruPay defining the problem as the location of PSK customers.

71.    The situation developing on Jan 2nd was a crisis for PSK. This was the second week of PSK's relaunch of retail sales as well as the sales launch of a long-expected guidebook. Hundreds of advisories had been sent to customers that retail sales were back online and the new guidebook was now available. Panic was noticeable in PSK's response to King at 4:13PM on the same day;

> "We need to sort this out quickly. I received a further email from Cristine Pohl at 2:38, saying:
>
> > 'To continue using this account, payments from international/non-US card holders must remain below 30% to meet card brand regulations. Please let us know how you would like to proceed.'
>
> "She's ducking the question of whether AltruPay is still processing or will continue to process for transition or whether you folks are dropping me without warning. This is, incidentally, exactly what I was worried of when we signed, and **you may recall my asking whether you'd work with us should an issue arise** or whether you'd suddenly drop service. [...] Are you available for urgent discussion Friday morning?" [emphasis added] [Ref p.385]

72.    The following day, Jan 3, 2025, Pohl wrote at 9:57AM as follows;

> "The risk team has been actively working with you since December 12th to ensure compliance with card brand regulations. During this process, it was discovered that more than 30% of your sales are international, which does not align with the approval terms for US-based accounts (which require the majority of sales to be domestic). The risk team has clarified that, in order to continue using the account, you must adhere to **the**

12

> ***requirement of processing no more than 30% international sales.*** *If you are unable to agree to this, the account will need to be closed."* [emphasis added] [Ref p.386]

73.    There were issues with the AltruPay response. PSK had no idea what the "Risk Team" referred to, no idea what "brand regulations" were being breached, no idea how AltruPay could have only "discovered" where PSK's customers were during review after they had been proactively disclosed from the start, and no idea what "approval terms" were being referenced as PSK couldn't find any such terms in the signed contract.

74.    This was also the <u>fourth statement</u> by AltruPay defining the problem as the location of PSK customers.

75.    In response, PSK emailed King at 10:24AM of the same day asking that he "urgently advise;"

> *"Who is the "Risk Team" making the "approval terms" for US based accounts? Is this an AltruPay defined term? VISA? Other?*
>
> *Is the 30% threshold common? That is, am I going to have to watch for this elsewhere or is this internal to AltruPay?*
>
> *As **the first I'd heard of this 30% rule was yesterday,** and as setting up with another processor will take time, will you commit to bridging PSK through the transition?"* [emphasis added] [Ref p.387]

76.    In his response on the same day, King did not answer the first question, advised that he did not know the answer to the second question, and ducked the third question entirely [Ref p.392].

77.    King's response was also the <u>fifth statement</u> by AltruPay defining the problem as the location of PSK customers.

78.    PSK was frantically trying to find a replacement merchant account provider, a difficult task while still falsely listed on MATCH. Still hoping to rescue the AltruPay contract, PSK emailed Pohl at 11:11AM Jan 6, 2025 asking as follows;

> *"Who is the "Risk Team"? Is this in-house? VISA? Could you please identify?*
>
> ***I reviewed the AltruPay contract again on the weekend and could not find a reference to 30% domestic sales thresholds.*** *Could you please direct me to that section?"* [emphasis added] [Ref p.388]

79.    Pohl responded at 11:38AM the same day, as;

> *"I believe Kyle has already answered these questions for you on Friday. The risk team works closely with the processing bank, in this case, FFB Bank. We only offer domestic merchant accounts, meaning **most transactions must be made with US-based cardholders.** […] Please confirm you understand the merchant account requirements and that **sales must have a majority presence in the US**. Not responding your acknowledgment may result in holds to the account."* [emphasis added] [Ref p.389]

80. This was also the <u>sixth statement</u> by AltruPay defining the problem as the location of PSK customers.

81. At 1:30PM on Jan 7 2025, PSK wrote to Pohl a hefty and important email, as follows;

> "I note that the status of the account has changed to "On Hold" and I don't know what that means either. I am concerned that AltruPay is unilaterally suspending service despite our contract being one month old and Kyle having assured me less than a month ago that you definitely don't behave like this. **<u>Could you please urgently confirm that you are not halting service, at least until we can get a replacement contract in place?</u>**" [emphasis in original] [Ref p.390]

82. In the same email, PSK directly challenged the AltruPay narrative, noting the non-existence of the sales thresholds AltruPay was claiming were in breach;

> "Re: the AltruPay contract; I note that there appears no domestic threshold in the AlturPay contract and, as you know, I have no means of knowledge of any additional contracts between yourselves and another bank. As you also know, we have been fully transparent with AltruPay from first discussion on our business and our customer base and its location. In other words, unless I am missing something in our contract, **AltruPay knowingly signed the contract and is now choosing to breach contract.** Am I missing something? Please do advise." [emphasis added] [Ref p.390]

83. Closing the same email, PSK questioned if we were really responding to the right issue, whether foreign sales thresholds were really the driver of AltruPay's conduct, as;

> **"If there is something else and additional going on I think it would be in both our interests to disclose the matter so it can be cleanly dealt with."** [emphasis added] [Ref p.390]

84. At 1:43PM of the same day, Pohl replied as follows;

> "As previously communicated, the account can only remain active if the business complies with the domestic payment requirements. Specifically, this means that payments must predominantly originate from US customers (with a general guideline of 70% US / 30% international). If the risk team does not receive your acknowledgment or continues to observe a majority of international/non-US payments, they will be required to proceed with account closure, as this would not meet the merchant account guidelines" [Ref p.391].

85. This was also the <u>seventh statement</u> by AltruPay defining the problem as the location of PSK customers.

86. At 2:51PM on the same day, PSK replied to Pohl that "this is getting old quickly."  PSK was frantic and getting a run-around at AltruPay.  Responding to the allegation of breach of "domestic payment requirements," PSK wrote;

> *"Where are these "domestic payment requirements" stated please?  I have asked you to identify them in the contract as I cannot find them anywhere therein"* [Ref p.393].

87. Responding to the allegation of breaches of "the merchant account guidelines," in the same email PSK wrote;

> *"Where are these "merchant account guidelines" stated please?  I see nothing about domestic vs international payments at all in the contract.*
>
> *"Look, it seems that you are trying to apply regulations from some other contract that you have bound AltruPay to, presumably with a bank.  If so, I am unaware of these particulars and have not signed those commitments.  Perhaps you could demonstrate these "requirements" and "guidelines" in the contract?  If not, how can I possibly be held to terms I did not agree to, had no knowledge of, and are now being introduced after our contract was signed and service commenced?  That would be a breach of the AltruPay contract.*
>
> *[…]*
>
> *"Cristine, we can figure this out, there are ways to sort this, but nothing is possible with all this stonewalling.  Could you please, PLEASE, show me in the contract the requirements we've been discussing? [emphasis in original]*
>
> *"I could, for instance, purchase my own products with a US card as a bridge to hold the percentage down [until a replacement merchant account provider was onboard]"* [Ref p.393].

88. The COO of AltruPay, Bill Glass, took over the discussion at 11:29AM, Jan 8 2025, advising that "all questions to any additional team members will be forwarded to me to handle from this point forward."  Glass further wrote as follows;

> *"My name is Bill Glass, and I am our Chief Operating Officer. When speaking about a risk profile, we as the "ISO" and the "Bank" both have risk teams. This response is coming from the bank. The bank's policy is to keep chargebacks under 1% and have no more than 30% international transactions. Outside of that, your frustration lies in you asking this during your conversations when you first started with our team. I understand this, but our team understood your business model to be a U.S.-based entity with some sales in Canada. If you had expressed that your transactions were primarily Canadian, we would have advised you to go to a Canadian processor. **Your account is not being shut for fraud; it is being closed due to risk restrictions on the percentage of non-U.S. transactions"** [emphasis added] [Ref p.394].

89.    His statement that none of this would have happened if only PSK had expressed that our customers were mainly Canadian is false. AltruPay was advised from the onset clearly, transparently, and repeatedly of PSK's business model, its history, and its customer base.

90.    This statement of Glass was also the <u>eighth statement</u> by AltruPay defining the problem as the location of PSK customers.

91.    PSK responded to Glass at 11:29AM on the same day;

> "Bill, this is an AltruPay driven issue. I was fully transparent in my dealings with you. You knew that my company sold Canadian books and near exclusively into the Canadian market, this was the core of our discussion at the intake. It appears that your other contracts, of which I could have no knowledge, preclude the dealings you voluntarily entered with me. I understand this and am working to set up a replacement in order to exit your system. **To close my account prior to that transition will be harmful to my business and damaging to my business reputation.** [emphasis added]

> "Given that our contract contains no stipulations on international thresholds and in the context of AltruPay having full knowledge of my business, canceling our contract is a breach of contract. Beyond the damage to my business in suddenly having no transaction processing, my company is too small for in-house IT. We have to contract this. We are now having to start the merchant account contracting process all over again at considerable expense and then having to engage IT, again at un-budgeted expense, in order to transition away from AltruPay all due to AltruPay driven actions.

> [...]

> "I have noted in previous emails that I could purchase my own products on my own US card to hold the percentage down until transition. This is an option!

> "I am requesting that you honour the contract you entered into and further honour the commitment made by your team [Kyle King] not to unilaterally and suddenly cancel the account until the transition has been accomplished. I await your urgent response" [Ref p.395].

92.    AltruPay did not respond to this email.

93.    At 6:40PM on Jan 8 2025, PSK contacted Brice Giesbrecht, PSK's IT contractor, to deliberately constrict sales on the PSK website in response to AltruPay's statements regarding foreign sales. Giesbrecht asked "why they are doing this?" PSK replied; "This crisis isn't CSA related it's that [AltruPay] doesn't do Canadian transactions and, though I detailed my company for them, they signed me up without noticing the preclusion" [Ref p.396 – 398].

94.    PSK's biggest retail sales are from its Residential guidebook. In order to reduce foreign sales volumes, PSK halted all sales of Residential on Jan 8. Likewise, PSK stopped the marketing process for Knight's Code, the new guidebook still in launch processes, resulting in a drop-off in sales from Jan 8. These two books are responsible for more than 75% of PSK revenues. All this was voluntarily constricted in response to AltruPay's foreign sales threshold demands.

95. Notwithstanding PSK's voluntary sales reductions, and without advance notice, AltruPay unilaterally closed the PSK account at 3:00PM, Feb 6, 2025 [Ref p.399 – 402]. PSK was once again entirely without retail sales, this time during a website relaunch and a new book launch. Calling this damaging would be an understatement.

96. Also on Feb 6 2025, Fresno First Bank ("FFB") in California falsely listed PSK on the MATCH blacklist, purportedly for violations in relation to AltruPay [Ref p.403 – 404]. FFB is the bank partnered with AltruPay for credit card processing. Therefore, thanks to AltruPay and their subcontractor, PSK was once again on a money laundering blacklist.

97. On Feb 28, 2025 AltruPay assessed a "Non-Compliance Fee" of $1,875 by seizing all of the funds in PSK's reserve account under AltruPay's control. The AltruPay email advising of this blamed Mastercard [Ref p.405].

98. On March 4, 2025 PSK's corporate account at Chase was looted of $2,103.31 under the MATCH seizure provision [Ref p.406]. There was no warning of a coming seizure, no notification that a seizure had been made, and no provision for appeal. PSK learned that funds had been stolen from its Chase account on March 19, 2025.

99. At 12:39PM, March 19 2025, PSK wrote to Glass as follows;

> "On March 5th, we have received an AltruPay ticket showing a seizure of $1,875.00 from the PS Knight (PSK) reserve account purportedly for "non-compliance." Your statement blames the AltruPay seizure on MasterCard, though AltruPay did the deed.
>
> "I remind you of our past communication, that the alleged non-compliance on which basis AltruPay shuttered our account was for having too many sales outside the United States. As noted at the time, domestic sales thresholds are not in the contract and were added as a condition by AltruPay after the fact, and have nothing to do with MasterCard.
>
> "This is stealing. You have colluded in theft from PSK, I am not pleased.
>
> "I further note that on March 4th AltruPay seized $2,103.31 from the PSK account at Chase under the name "M Merchant." I researched and found that this listing refers to AltruPay, not the entity M Merchant Services ["M Merchant Services" is an unrelated entity of that name].
>
> "This is stealing, Sir! You cannot get away with this nor can you plausibly blame others for your conduct.
>
> "As you may reasonably assume, I cannot stand idly while you help yourselves to thousands of dollars of PSK money without lawful basis and taken without warning or notice from our bank accounts, whenever it pleases you. By necessity, I have to deal with this.
>
> "I demand that you return the full value that you have stolen ($3,978.31). This is the cheapest, easiest way out for you.

> *"If you do not return the stolen money by the end of the month I will pursue regulatory, legal, and media options to compel you into compliance with your own contract and to introduce a modicum of accountability to AltruPay" [Ref p.407].*

100.   This is the most assertive PSK communication made to AltruPay, reflecting a degree of outrage over their unethical behavior.

101.   At 12:56PM on March 21 2025, Glass responded, as;

> *"There is no refund of $1,875 to be issued, as Mastercard, not AltruPay, implemented this charge.*
>
> ***"The specifics were Canadian Standards Association - Intellectual Property Infringement. You would need to have the right to resell these books.*** *Your account was flagged and fined directly by Mastercard.* ***The percentage of transactions between Canada and US is not the issue it is the infringement"*** [emphasis added] [Ref p.375].

102.   This is their first mention of PSK's competitor, CSA (aka Canadian Standards Association), as having any role in the situation.  After <u>eight clear declarations</u> that the problem was non-compliance with foreign sales thresholds, AltruPay finally admitted that foreign sales were never the issue at all; it was CSA all along.

103.   AltruPay deliberately deceived PSK as to the nature of the problem, preventing PSK from responding to it.

104.   Previously, Glass had stated that; "Your account is not being shut for fraud; it is being closed due to risk restrictions on the percentage of non-U.S. transactions" [Para 88].  Now Glass declared the opposite.

105.   The Fifth Circuit Ruling and Supreme Court Order, related Court Mandating documents, and summary statements from PSK legal counsel could have been furnished to AltruPay to demonstrate that there was no intellectual property infringement and therefore no fraud, no crime, and no standards violation.  Likewise and subsequently, AltruPay would've been able to advise the bank they had subcontracted to, as well as Mastercard, to have headed-off another false MATCH filing.  PSK could have reached out to these parties also, had PSK known what the issue really was.

106.   All parties; the subcontracted bank, Mastercard, the mysterious "Mavericks" mentioned by Carlson -all these could've halted the damage had AltruPay enabled PSK to fulsomely respond to what were, at the time, secret allegations.  Instead they lied, other parties acted without exculpatory data, and PSK paid the price.

107. Indeed, AltruPay CEO Adam Carlson admitted that all this was avoidable in an internal AltruPay email sent at 9:25AM, March 19, 2025, saying;

> *"Hahaha. This fucking guy. IIRC, we gave him multiple chances to fix the issue and he just kept processing.*
>
> *"Mavericks not gonna refund it and we're not gonna give him $1875 or whatever amount he concocted in his head.*
>
> *"You can handle.  If he actually sues us we'll just forward to Maverick and/or counter sue to release us from the suit and for our legal fees…. which will be excessive"* [Ref p.375].

108. As noted above and contrary to Carlson's statement, PSK was not given "multiple chances to fix the issue," as AltruPay had repeatedly lied to PSK about what the issue was.  Due to AltruPay conduct, PSK was trying to frantically solve a non-existent foreign sales threshold problem rather than the actual problem; a false allegation against PSK by CSA.

109. AltruPay's preferred tactic when caught is also worth noting; the deliberate inflation of legal fees to "excessive" levels, then pinning them on the victim to pay [Para 108].

The limited chronology of context and events described above

November 25 2020
- CSA Files in Federal Court against PSK

- The Canadian argument is that private ownership of Canadian legislation should be enforced inside the US without regard to US law and US Court rulings specifically denying the legitimacy of private claims to ownership of law.

July 12 2021
- CSA files an Application for Preliminary Injunction against PSK

March 18 2022
- Federal Court denies the CSA's attempted injunctive against PSK books due to weakness in CSA's position and their unlikelihood of success.

June 5, 2022
- Announcement of the coming book release of *Deep Six Diaries.*

June 27 2022
- PSK's merchant account provider, Stripe, advises that PSK has been designated on the MATCH list for selling "illegal products," less than three months after Federal Court denied CSA's injunctive [March 18, 2022]. The false MATCH filing was done by BMO, though BMO's role was unknown at the time.

- PSK loses its ability to conduct retail sales until signing a new provider, EMS / PaymentCloud

October 13 2022
- PSK's new merchant account provider, EMS / PaymentCloud, advises that PSK has been re-designated on the MATCH list, again by BMO

- PSK again loses its ability to conduct retail sales

October 15, 2022
- Maintenance pages on PSK websites go up

November 13, 2022
- Last article on the Knight website before site transition for the *Deep Six Diaries* book launch.

November 19, 2022
- Start of Amazon sales of *Deep Six Diaries*

November 19 – 30, 2022 (exact date unknown)
- CSA falsely advises Amazon that *Deep Six Diaries* is counterfeit and PSK sales on Amazon halted

January 4, 2023
- Federal Court initially rules against PSK and PSK subsequently launches an appeal

July 16, 2024
- The Fifth Circuit Court of Appeals rules in favor of PSK, reverses the Federal Court ruling

July 30, 2024
- CSA petitions the Fifth Circuit Court of Appeal for an en-banc re-hearing

August 9, 2024
- Mandate is issued reversing the Federal Court ruling.

August 14, 2024
- Fifth Circuit Court of Appeals denies CSA's en-banc petition

September 18, 2024
- Order closing the case in PSK's favor

December 11, 2024
- PSK begins retail sales through AltruPay

January 7, 2025
- MATCH identifies BMO as originator of the PSK / Knight listings of 2022

January 10, 2025
- FFB Enters Consent Order for AML violations

January 21, 2025
- Supreme Court denies CSA's petition to appeal

January 22, 2025
-    FFB issues News Release promising to comply with AML cleanup order

January 27, 2025
-    Knight makes first call to BMO on the fraudulent PSK / Knight listings

February 6, 2025
-    AltruPay breaches PSK contract, halts PSK retail revenue, freezes PSK accounts, seizes PSK merchant account funds.

-    FFB lists PSK and Knight on the MATCH list, though this was unknown to Knight at the time.

February 19, 2025
-    Knight learns that PSKO is also designated on MATCH, placed by BMO's personal designation of Knight

February 28, 2025
-    Mastercard falsely advises FFB of PSK "activity that is illegal" twenty-three days _after_ FFB had already placed PSK and Knight on the MATCH list

March 10, 2025
-    BMO, through its partners, removes PSK and Knight from its own MATCH listing

March 19, 2025
-    PSK begins retail sales through Paymentech LLC, a division of Chase.

-    PSK learns that PSK and Knight are still on the MATCH list due to FFB filing on February 6, 2025

May 15, 2025
-    Paymentech falsely cancels PSK account for "illegal activities," freezes PSK bank account funds, seizes PSK merchant account funds.

### The Damage to PS Knight

Financial Harm

110.    Damages to PSK are born by Knight, in salary and in lost future financial security.  As with many single operators of small businesses, the line dividing corporate and personal can be hazy.  In this case, the PSK office is Knight's living room, the PSK desk is Knight's desk, and Knight owns one computer serving both business and personal purposes.  As PSK is the only income for Knight, the two are inextricably linked; losses for one are experienced by the other.  In this context, the total loss of PSK retail sales was a direct and devastating loss for Knight.

111.    On the basis of FFB's fraudulent filing and Altrupay's conduct thereupon, several specific losses were resulted;

The constriction and eventual termination of sales on the PSK website resulting in financial loss;

112.    In response to AltruPay's deceitful statements of foreign sales thresholds, PSK was compelled to halt sales of its Residential guidebook on Jan 8 as well as to halt marketing of its Knight's Code, slowing its sales from Jan 8 also [Para 93].

113.    (B) The unilateral cancellation of the PSK – AltruPay contract resulting in the total loss of PSK retail sales;

114.    The loss of retail presence at any time is bad for corporate reputation.  As a competitor, CSA has long denigrated PSK in the market with allegations of illegitimacy and unreliable availability, the latter usually caused by CSA itself.  Suddenly losing retail availability appeared to vindicate this false foreign narrative.

115.    There are specialized consultants capable of providing cost analysis of reputational harm.  The studies produced by these specialists are very expensive and well beyond the means on PSK under the circumstances [Para 129].  In this, the best damage assessment PSK can offer is that the sum of all direct damages resulting from AltruPay conduct is in the tens of thousands of dollars and the sum of indirect, long term damage is into the millions.  The sum of damage from AltruPay and FFB, merely the latest such damage PSK has had to endure from CSA proxies, is deep into the millions of dollars.


The unlawful seizure of funds from PSK's corporate bank account;

116.    The looting of PSK's Chase account was done via Mastercard as a result of AltruPay's false conduct with MATCH and collusion with FFB.  Had PSK been able to refute the false allegations with FFB this looting could not have taken place.

117.    Abuses of the MATCH list have been the subject of recent and ongoing PSK discussions with a number of Congressional offices.  Deliberately listing one's competitor by false allegations on the MATCH list in order to sabotage their sales and reputation, then on the basis of that false listing to seize the contents of their competitor's banks accounts to deprive them of the financial means to defend themselves is a widespread nefarious practice.  PSK is using its experience with AltuPay to encourage regulatory reform.


Cascaded financial consequences;

118.    Without revenues, PSK cannot afford an accountant to file corporate income tax, needful to subsequently file Knight's personal tax.  Of course, without revenue and without salary, no tax is owing but in consequence neither detail is available on Knight's current impecuniosity.

119.    Knight has a personal bank account with resources for a few months of food and lodging.  Due to Altrupay's conduct and that of its partner FFB and other CSA directed entities, Knight has no savings, no investments, no pension, and no other source of income.  PSK was and remains Knight's only source of financial security and retirement.

120.    In this context, Knight's direct financial damage, tied to PSK damage, is long-term, substantial and debilitating, and also noticeable within this action. That is, one consequence of AltruPay's sabotage of PSK sales is the absence of financial heft to hire legal counsel. Perversely, AltruPay's conduct impairs the victim's effort to defend himself.

Reputational Harm

121.    AltruPay's fraudulent conduct has likewise badly damaged PSK's and Knight's reputation.

122.    As a competitor, CSA has long denigrated PSK in the market with accusations of illegitimacy and unreliable availability, the latter usually caused by CSA and proxies like AltruPay or FFB engaging in illicit means to impede PSK business. The fraudulent FFB MATCH filing and consequential PSK embarrassment of loss of market presence are unquestionably damaging. Further, the impediments to PSK product availability appear to confirm CSA / BMO / FFB's false allegations, providing the venire of respectable and authoritative third-party affirmation of PSK's illegitimacy.

123.    This is perverse, in that PSK was found innocent at the Fifth Circuit whereat PSK and Knight's conduct was deemed unambiguously lawful and legitimate. That is, CSA / BMO / FFB / AltruPay have buried Knight in the damages of having lost their case when in fact PSK and Knight had won. It is as though the rulings of the Fifth Circuit held no authority over these people; they would ensure the market treated Knight as though PSK had been found guilty. In this, AltruPay's conduct is contemptuous of US court.

124.    AltruPay's defiance of the Fifth Circuit ruling meant that PSK vendors, customers, and contractors were left with the impression that PSK and Knight were guilty, unethical, and unreliable. Knight had to personally explain to vendors why PSK's automated debit payments were suddenly declined and to contractors why PSK was unable to make timely payments for service agreements made in good faith.

125.    Beyond the damning matter of reputational damage to PSK impacting Knight, the name itself is damaged. That is, PSK is PS Knight Americas Inc; "Knight" is the Plaintiff's last name. For reference, the founder of PSK was Knight's father, Peter Slim Knight, from which the corporate initials PSK are derived. Knight's reputation is tied to PSK due to the family name and due to longevity.

126.    In this, reputational damage to Knight is widespread, well beyond the confines of electrical guidebook publishing, and will surely manifest in other financial endeavors pursued by Knight.

127.    There are specialized consultants capable of providing cost analysis of reputational harm [Para 117]. The studies produced by these specialists are very expensive and well beyond the means on PSK or Knight under the circumstances. In this, the best damage assessment Knight can offer is that the sum of all direct and indirect damages, both immediate and long-term, resulting from AltruPay's fraudulent conduct is into the millions of dollars.

128.    In the absence of specialized accounting, yet in the presence of recent precedent of Canadian bank AML abuses in USA v. TD (2024) [2:24-cr-00667-ES], Knight appeals in the calculation established by that court and takes it as a given that precedent in one case of Canadian AML

abuse will be adhered to with another of Canada's AML abusing bank proxies, in this case through its partners FFB and AltruPay.

### Personal Damage

129.    However difficult to quantify, Knight has notable experience in struggling through multiple years of expensive litigation without the revenues to pay PSK counsel, vendors, or his own rent and groceries.  As with all such experiences, one gets creative and one gets through but, as the basis for Knight's treatment at the hands of AltruPay was entirely fraudulent, one must insist upon a reckoning.

130.    This is the fourteenth year of the Canadian Government's war on Knight, PSK and, until his death in 2016, Knight's father Peter Knight.  For Knight, this is the fourteenth year of sustained, elevated stress.  It is the fourteenth year of living like a pauper, eating mean, living cheap, and barely getting by.  AltruPay's fraudulent conduct in the service of CSA was surely contributory to their partner's war on Knight, and AltruPay's behaviour also exacerbated Knight's impecuniosity by cutting off PSK revenues entirely which comprise the only source of Knight's personal salary and retirement.

131.    AltruPay has chosen to participate in a long-term campaign of "lawfare;" the abuse of governmental authority and legal processes, in this instance featuring AltruPay collusion in defiance of a Fifth Circuit Court Ruling, a fraudulent MATCH filing by their partner FFB in collusion with a foreign government, and a multi-month record of deceiving Knight as to the nature of AltruPay conduct.

## Causes of Action

### Breach of Contract

132.    As the Fifth Circuit had Ruled in favor of PSK and Knight, finding them innocent of what AltruPay and FFB declared them guilty of, there was no basis for termination of the merchant account contract.  In this, AltruPay's termination was fraudulent and unlawful.

133.    AltruPay's deceitful conduct toward Knight, preventing defence against what were then allegations kept secret by AltruPay, is not consistent with principles of honest dealing.

134.    AltruPay's incuriosity and resulting total lack of due diligence to confirm their partner FFB's allegations against PSK is not consistent with due diligence requirements of financial entities operating in the US.

### Lantham Act

135.    The Lantham Act is one of several laws addressing fraud committed by banks or financial institutions, focussing on deceptive practices, misrepresentation, or intentional misconduct.

136.  Lantham is relevant in this instance because AltruPay's fraudulent treatment of PSK and Knight is deceptive to financial vendors of PSK in misrepresenting PSK and Knight's conduct with regard to the law, was intentional, and was made in a commercial context causing lost sales and reputational harm to Knight's corporate asset and only source of income.

137.  AltruPay's conduct against PSK and Knight is fraud. AltruPay has been caught colluding in the use of an anti-fraud blacklist to harm an innocent TX company to the benefit of a fraudulent Agency of a foreign government. This is also perverse. AltruPay's collusion in the fraudulent use of anti-fraud protocols is an inversion -that is, a perversion- of their legislated purpose.

## Commercial Disparagement

138.  Treatment of PSK and Knight as guilty of conduct the Courts had already found them innocent of, and such treatment undertaken in the knowledge of obvious consequential harm (in this instance, sabotaged sales and financial and reputational harm to PSK and Knight) is basis for a finding of trade libel, provided the designation caused financial loss.

139.  AltruPay wasn't trying to treat either PSK or Knight kindly. AltruPay either knew or was deemed to know that treating PSK and Knight as criminals would be financially and reputationally destructive. AltruPay's behavior toward PSK and Knight was therefore malicious, caused financial loss, and meets the legal criteria of commercial disparagement.

## Defamation

140.  Treating PSK and Knight as guilty in the full light of day and in defiance of the Fifth Circuit Ruling are basis for a finding of defamation in the presence of demonstrated proof of falsity, malice, and harm.

141.  AltruPay is deemed to have had full knowledge of the Court's validation of PSK's sales activity because Court rulings are public and PSK and Knight were known to, and contactable by, both AltruPay and their partner FFB, both directly and through the latter's partner CSA. AltruPay made no effort to verify their allegations against PSK or Knight. Indeed, AltruPay refused even to advise PSK and Knight what the nature of the alleged banking problem was. Rather, AltruPay deliberately and repeatedly lied to Knight as to their concerns and the source thereof.

142.  AltruPay's conduct was therefore to defame innocent parties with the taint and stigma of guilt. That is, AltruPay and its partner FFB have chosen to involve themselves in a 14-year unlawful harassment and defamation campaign against PSK and Knight.

143.  All aspects of defamation are demonstrable; falsity, malice, and harm.

## Tortious Interference

144. Fraudulent designations also support claims of tortious interference with business relationships or prospective economic advantage if they disrupt contracts or opportunities.

145. Causing first the constriction of retail revenues [Para 93 - 95], followed by the total loss of retail revenues, at the hands of AltruPay is quite clearly an instance of tortious interference in the business of PSK and its owner Knight.

## Negligence

146. AltruPay's failure to verify the allegations against PSK and Knight constitutes grounds for a negligence claim, especially if the Plaintiff suffered financial losses due to the error and provided the claim of Commercial Disparagement is defeated for lack of proven malice.

## Breach of Bank Fraud Statute ("BFS") (18 U.S.C. 1344)

147. The BFS criminalizes knowingly executing or attempting to execute a scheme to obtain money, assets, or property under a bank's control through false or fraudulent pretenses.

148. The BFS is a very short statute, quoted in full;

> "Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

149. The reference to "knowingly" refers to awareness of the conduct being engaged in, not awareness of the illegality of that conduct.

150. There is little maneuvering room for AltruPay. The DOJ has consistently chosen to retain interpretations of acts covered by the BFS in "the broadest and most general terms." In essence, the BFS applies to any fraudulent act by which property of value held within the authority of a financial institution is acquired by dishonest methods or schemes.

151. As noted above, PSK accounts were looted by AltruPay on the false basis of the filing of their partner FFB's filing. As the funds within these accounts were falsely seized and that AltruPay executed the seizures of PSK assets "within the authority of a financial institution," the conduct of the Defendant clearly and easily satisfies the criteria for BFS violation.

152. The BFS is only actionable in civil litigation indirectly, in cases of fraud committed by a financial institution such as AltruPay, in this instance supporting the claim that their conduct in defiance of its BFS obligations directly harmed PSK and Knight.

Breach of Bank Secrecy Act ("BSA") (31 U.S.C. 5311 et seq.)

153.    The BSA requires financial institutions to maintain honest records and file accurate reports to prevent fraud, money laundering, and other illicit activities.

154.    AltruPay is a financial institution for purposes of the BSA, as under BSA definitions.

155.    The fraudulent use of anti-fraud protocols and false designations related thereto, is clearly a violation of the BSA, particularly though not exclusively the BSA requirements of due diligence in AML compliance programs and of accurately reporting of suspicious activity (Suspicious Activity Reports / SARs) with regard to CSA's illicit conduct against US entities such as PSK and Knight.

156.    The BSA is only actionable in civil litigation indirectly, in cases of fraud committed by a financial institution such as AltruPay, in this instance supporting the claim that AltruPay's refusal to comply with its BSA obligations facilitated harm to PSK and Knight.

Breach of Wire Fraud Act (18 U.S.C. 1343)

157.    The Wire Fraud Act applies to financial institutions perpetrating fraud by use of interstate wires, (such as digital transactions typical to banking and including digitally stored blacklists such as MATCH). This statute covers schemes involving false representations or deceit to obtain money or property.

158.    Wire fraud requires three elements, as; 1) use of a "scheme or artifice" to defraud another; 2) an intention to defraud another, and; 3) interstate wires must be used in the act.

159.    In this context; 1) AltruPay fraudulently colluded in the use of an anti-fraud artifice, MATCH, to defraud PSK and Knight, causing significant damage; 2) AltruPay intended that damage to PSK and Knight, indeed harming PSK and Knight was the whole point of their partner FFB's false filing of PSK and Knight on MATCH, and; 3) AltruPay executed this operation from within the United States in collusion with and entity out of State (CA), on the instruction of a foreign government. All elements are met.

160.    The Wire Fraud Act is only actionable in civil litigation indirectly, in cases of fraud committed by a financial institution such as AltruPay, in this instance supporting the claim that AltruPay's gross violation of its Wire Fraud Act obligations directly harmed PSK and Knight.

Breach of Consumer Financial Protection Act ("CFPA") (Title X of Dodd-Frank Act, 12 U.S.C. § 5481 et seq.)

161.    The CFPB, an amendment to the National Bank Act, prohibits unfair, deceptive, or abusive acts or practices by banks in consumer financial products or services. With respect to AltruPay's fraudulent treatment of PSK and Knight, the CFPB establishes prohibitions against Unfair, Deceptive or Abusive Acts and Practices (UDAP) as follows;

*162.*    *UDAP Prohibitions 1031 and 1036 of CFPA*

Unfair Acts or Practices
-        Substantial injury to consumers
-        Not reasonably avoidable by consumers

Deceptive Acts or Practices
-        Misleading or false representation
-        Likely to mislead a reasonable consumer
-        Material to consumer decision-making

163.    UDAP Prohibition 1036(a)(1)(B)

Unfair, Deceptive or Abusive Acts
-        Knowingly misreporting information about a victim's financial behavior
-        Contributing to blacklists or databases that result in unjustified harm

164.    AltruPay's decision to harm PSK and Knight through fraudulent and unlawful termination based on their partner FFB's fraudulent designation of PSK and Knight on an anti-money laundering blacklist is unambiguously unfair, deceptive, and abusive. All CFPA criteria are met.

165.    The CFPA is actionable in civil litigation in instances of direct harm to consumers resulting from deceptive practices such as those of AltruPay. The CFPA is also actionable in support of the balance of the Plaintiff's claim against AltruPay.

Executive Orders and Related Statutes

166.    Executive Order 14161 (January 20, 2025)

167.    Titled; "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," the EO emphasizes enhanced vetting and screening to prevent foreign nationals from undermining U.S. constitutional rights. While focused on immigration, this EO directs agencies against foreign entities which harass, harm or target U.S. citizens to suppress rights.

168.    EO 14161 is not directly actionable in civil litigation but is applicable in support of the balance of Plaintiff's claims. AltruPay's collusion through FFB with an Agency of the Government of Canada, unlawfully operating within the United States, places EO 14161 into relevance in this case.

Foreign Agent Registration Act (FARA) 22 U.S.C. 611 et seq.

169.    FARA requires individuals or entities acting on the instructions or in the interests of foreign governments to register with the Department of Justice and disclose their activities, relationships, and financial compensation. It promotes transparency to prevent covert foreign influence, including actions that could involve harassment or targeting of US persons or entities.

170. While typically referenced in lobbying activity, FARA also applies to unregistered entities acting on the instructions of a foreign government to intimidate or harm US entities, such as AltruPay and FFB following the orders of the Canadian Government's CSA.

171. In example, in 2017, RT America was required to register as a foreign agent under FARA for its activities on behalf of the Russian government. Similarly, operating illegal overseas intimidation or coercion actions, like informal police stations (e.g., by the Chinese government), have been prosecuted as unregistered foreign agent activities.

172. On these basis and precedent, AltruPay is in breach of FARA requirements and should be compelled to lawfully register thereat.


Punitives and Losses Calculation

173. The case of USA v. TD Bank of October 10, 2024 -barely one year ago- is the nearest precedent on which to gauge equivalent AML violations, as a guideline from criminal law to inform this civil proceeding. While the subject vehicle is identical (anti-money laundering / anti-terrorism protocols), and the core body of applicable law is identical (AML focussed legislation and EO's, as noted above), and while the origin country of the violating foreign bank is identical (Canada), there are relevant differences between this case and USA v. TD Bank as follows;

174. The sums affecting PSK and Knight are lesser than those noted in USA v. TD Bank, yet are greater as a percentage -and indeed in absolute terms- than losses suffered by the Plaintiff in TD Bank, namely the Government of the United States. The Plaintiff in this critical precedent claimed no financial losses worth noting.

175. In the context of no losses to the Plaintiff in the precedent case, in taking the legislation and EO's applicable to both this plea and that case, the ratio of punitives to forfeiture / plaintiff loss recovery was 3:1. That is, of the $1.886 billion applicable, 76% took the form of punitives and 24% in forfeiture / plaintiff loss recovery. The USA v. TD Bank settlement was to have been a watershed, the largest banking settlement ever; a sort of high-profile warning message to other foreign banks against AML or equivalent fraudulent practices inside the United States.

176. This filing notes a compensation sum of $20MM and identifies this figure as a placeholder value [Para 8(e)]. For reasons as outlined above [Para 117, 129], due to AltruPay's conduct it is impossible to quantify the financial losses suffered by Knight. In this, and in the above context of Knight's treatment by AltruPay and demonstrated damages therefrom, and in the further context of AltruPay's conduct with regard to Knight and in relation to, and at variance from, its legal obligations as a financial institution, the Plaintiff is content to accept whatever compensation is decided by the Jury.

**Plea to the Court**

177.    PSK assumes that AltruPay received a threat letter and / or false allegations against PSK and Knight from CSA directly or via AltruPay's partner FFB, though as yet we have no evidence of this. Discovery is expected to illuminate the specific origins of the fraudulent MATCH listing and whether encouragement or inducements had been given AltruPay to provide PSK with the false foreign sales narrative.

178.    Regardless of impetus, had AltruPay been honest with PSK about the true nature of their conduct instead of repeatedly deceiving PSK that the problem was entirely unrelated to CSA, then none of the damages PSK has suffered would have materialized.  AltruPay is culpable.

179.    In the context expounded in the paragraphs above and as noted on [Para 8], Knight seeks;

    a.    A Finding that the PSK contract was falsely terminated by AltruPay;

    b.    A Finding that AltruPay's fraudulent conduct toward PSK and Knight constitutes a breach of contract;

    c.    A Finding that by its fraudulent conduct toward Knight and his company, AltruPay is responsible for resulting financial harm on PSK and, directly and by extension, Knight, and an Order for compensation;

    d.    A Finding that by its fraudulent conduct toward PSK and Knight, AltruPay is responsible for public disparaging of PSK and misrepresenting PSK conduct, constituting false, misleading and deceptive business practice, is a defamation of PSK and, directly and by extension, Knight, and an Order for compensation;

    e.    An Order for compensation in the sum of all matters being $20MM, a placeholder amount;

    f.    A Finding in this matter before the Court that AltruPay is under the direction of FFB, itself under the direction or control of the Government of Canada through the latter's Agency; CSA;

    g.    A Finding that AltruPay has, in this instance, unlawfully operated as an arm of a foreign power (Canada) inside the United States to impede, harass, and harm a citizen of the United States (PSK) and its owner (Knight), and;

    h.    A Finding that based on the above, AltruPay is in breach of the following Causes, Federal and State Statutes and Executive Orders, subsequently actionable in criminal proceedings, listed as;

            -    Breach of Contract
            -    Lantham Act
            -    Commercial Disparagement
            -    Defamation
            -    Tortious Interference

- Negligence
- Bank Fraud Statute
- Bank Secrecy Act
- Wire Fraud Act
- Consumer Financial Protection Act

**Plaintiff's Name**
Gordon Knight

**Plaintiff's Signature**

TEC 940 843 5511
gordon.knighte pskuright.com

**Date**